# EXHIBIT C

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 3:23-cv-10050


* * * * * * * * * * * * * * * *

ELIZABETH COLEMAN,                 *

               Plaintiff     *

v.                                 *

HERB CHAMBERS BMW OF BOSTON,    *

a/k/a HERB CHAMBERS 1172, INC.; *

JOHN DOES I-X,                     *

              Defendants    *

* * * * * * * * * * * * * * * *



DEPOSITION OF:

MELISSA STEFFY

Conducted Remotely

November 20, 2023 at 10:04 a.m.




Christine M. Lo Schiavo

Professional Court Reporter

Melissa Steffy
November 20, 2023

1  production that was made by Herb Chambers in this

2  case, right?

3              MS. FUREY:  Objection.

4              THE WITNESS:  Yes.

5       Q.    (By Mr. Deutsch)  And you did

6  not see any record of correspondence between

7  Mr. Desroches and Ms. Coleman where, prior to

8  August 17, 2022, he communicated with her about

9  resubmitting an application for credit, right?

10             MS. FUREY:  Objection.

11             THE WITNESS:  I don't remember.

12      Q.    (By Mr. Deutsch)  And to the best of

13 your knowledge, you have not seen that?

14             MS. FUREY:  Objection.

15      Q.    (By Mr. Deutsch)  It's possible you

16 have, because you don't remember, but to the best

17 of your knowledge, you have not?

18             MS. FUREY:  Objection.

19             THE WITNESS:  I don't remember.

20      Q.    (By Mr. Deutsch)  Okay.  Now, if

21 that communication exists, it would have been

22 produced in discovery, right?

23             MS. FUREY:  Objection.

24             If you know.

Melissa Steffy
November 20, 2023

```
 1                THE WITNESS:  I don't know.

 2          Q.    (By Mr. Deutsch)  Do you have

 3   any reason to believe that Herb Chambers has

 4   withheld documents that would demonstrate that

 5   Mr. Desroches spoke with Ms. Coleman, via email or

 6   phone or text message, prior to August 17, 2022?

 7                MS. FUREY:  Objection.

 8                THE WITNESS:  No.

 9          Q.    (By Mr. Deutsch)  Do you know which

10   employee of Herb Chambers provided Sam Desroches

11   with the Coleman case file on August 17th?

12          A.    It would either have been Badis or

13   Mike Perry.

14          Q.    And when I say, "case file," the

15   term that the dealership uses is, "deal jacket."

16   Is that right?

17          A.    Correct.

18          Q.    Okay.  If I'm confusing you, and you

19   prefer me to use deal jacket, please let me know.

20   I'm going back and forth, and I realize that.

21                So it would have been Badis or

22   Mr. Perry that gave the case jacket to

23   Mr. Desroches?

24          A.    Or one of the sales managers.
```

Melissa Steffy
November 20, 2023

1    Once -- when a car comes in, it -- it would be

2    someone that -- it would either be the client

3    advisor or manager that would give it to the

4    business office, which was Sam's department, for,

5    you know, everything to be finalized.

6          Q.    Okay.  Now, have you seen any

7    communications from Badis between -- sorry.  Have

8    you seen any communications between Badis and

9    Ms. Coleman between -- strike that.

10               Have you seen any communications

11   between Badis and Ms. Coleman where Ms. Coleman

12   asks that her application for credit be

13   resubmitted?

14               MS. FUREY:  Objection.

15               THE WITNESS:  No, because I don't

16        think a -- a client would know to ask that

17        question.

18          Q.    (By Mr. Deutsch)  Have you seen any

19   communications between Mr. Perry and Ms. Coleman

20   wherein Ms. Coleman asks that her credit

21   application be resubmitted?

22               MS. FUREY:  Objection.

23               THE WITNESS:  It's the same answer.

24        You -- you -- I don't know a client would

Melissa Steffy
November 20, 2023

1        know to ask that question.

2        Q.    (By Mr. Deutsch)  Okay.  So it's

3   the -- it's my understanding, and -- and correct

4   me if I'm wrong, that the position of Herb

5   Chambers is that once Ms. Coleman submitted the

6   application for financing for a lease on April 30,

7   2022, that the dealership could resubmit the

8   application months later, in August of 2022; is

9   that correct?

10       A.    To honor the original terms and

11  conditions of the deal, yes.

12       Q.    Okay.  Now --

13       A.    It was unusual for that much time.

14  I mean, this is -- this is a different point in

15  history.

16       Q.    And Ms. Coleman was not asked by

17  Herb Chambers, in August of 2022, if she was still

18  wanting to pursue financing with BMW, correct?

19            MS. FUREY:  Objection.

20            THE WITNESS:  Ms. Coleman was not

21       asked in August of 2022.  I mean, looking

22       at the exchange, she hadn't even decided

23       which way she was going to finance with,

24       from the exchanges with  Mike Perry.

Melissa Steffy
November 20, 2023

1          Q.     (By Mr. Deutsch)   And Ms. Coleman

2    was never advised by Herb Chambers that, once she

3    submitted the application in April of 2022, she

4    was giving an open-ended authority for Herb

5    Chambers to resubmit her application at a later

6    date, right?

7                    MS. FUREY:  Objection.

8                    THE WITNESS:  It wasn't open-ended;

9            it was to honor the terms and conditions

10           she agreed to.

11         Q.     (By Mr. Deutsch)   If Ms. Coleman did

12   not want her credit to be run on August 17th, what

13   should she have done differently?

14                   MS. FUREY:  Objection.

15                   THE WITNESS:  I don't know, with the

16           information I have, from what I've read, if

17           she -- anything would have been -- if -- if

18           she said, I have secured financing, and

19           gave us a lienholder.  But there was --

20           from everything I read, she had made her

21           mind up.

22         Q.     (By Mr. Deutsch)   And she had made

23   her mind up how?

24         A.     Of where she was going to finance

Melissa Steffy
November 20, 2023

1  the car.

2      Q.    And what was the decision that she

3  made?

4            MS. FUREY:  I think you guys

5      are -- she said she hadn't made up her

6      mind.  That was --

7            MR DEUTSCH:  Oh, she hadn't made up

8      her mind.

9            MS. FUREY:  Yeah.  I think you

10     misheard her.

11            MR. DEUTSCH:  I did mishear her.

12      Q.    (By Mr. Deutsch)  Ms. Steffy, if

13  Ms. Coleman had -- well, strike that.

14            When you read the text messages

15  between Mr. Perry and Ms. Coleman, do you recall

16  seeing an exchange where Ms. Coleman expressed

17  concern about having her credit pulled again by

18  Herb Chambers?

19      A.    Yes.

20      Q.    Okay.  And Mr. Perry did not

21  document that in the case jacket, right?

22      A.    I didn't see any, no.

23      Q.    But Mr. Perry was aware that

24  Ms. Coleman was concerned about having her credit

Melissa Steffy
November 20, 2023

1  pulled a second time, right?

2           MS. FUREY:  Objection.

3           THE WITNESS:  Yes.

4      Q.    (By Mr. Deutsch)  And Mr. Perry told

5  Ms. Coleman that it wouldn't be pulled a second

6  time, right?

7           MS. FUREY:  Objection.

8           THE WITNESS:  I don't remember.

9      Q.    (By Mr. Deutsch)  Okay.  When the

10 case jacket was submitted to Badis, what was the

11 policy and procedure that triggered him to

12 resubmit the application at that time?

13     A.     Neither Badis or Mike Perry would

14 submit an application.

15     Q.     The application was submitted by

16 Mike Perry or -- or Badis?

17          MS. FUREY:  No.  She said,

18      "neither."

19          THE WITNESS:  Neither one of them

20      would submit an application; that would

21      have been done in the business office.

22     Q.     (By Mr. Deutsch)  Right.  Right.

23 So -- so when the -- so when the case jacket goes

24 to Sam Desroches, what is the policy and procedure

Melissa Steffy
November 20, 2023

1  that triggered him to resubmit the application?

2          A.      The deal looked like she was -- had

3  submitted an application online.  The approval had

4  expired.  We would have to resubmit the

5  application to BMW, and request that they

6  grandfather into the former approval.

7          Q.      Does Herb Chambers have policies and

8  procedures for the finance department

9  employee, in this case, Sam Desroches, to take

10  steps to verify the accuracy of the case jacket

11  before running the customer's credit?

12          A.      The customer requested the financing

13  on her own, so she had submitted the application

14  directly to BMW, not to Herb Chambers, and she

15  chose us as her dealer.

16          Q.      I'm asking about in August of 2022.

17  Was there a -- when the case jacket went to

18  Mr. Desroches on August 17th, was there a policy

19  and procedure in place by Herb Chambers for

20  Mr. Desroches to verify the accuracy of documents

21  in the case jacket before resubmitting the

22  application?

23                  MS. FUREY:  Objection.

24                  THE WITNESS:  The information on the

Melissa Steffy
November 20, 2023

1       application was all that Elizabeth Coleman

2       had submitted on her own, so we wouldn't

3       verify that.  We were just trying to get

4       her grandfathered into her original request

5       for financing.

6       Q.    (By Mr. Deutsch)  It was unclear, on

7  August 17th, how Ms. Coleman was going to be

8  paying for the car; is that correct?

9            MS. FUREY:  Objection.

10            THE WITNESS:  It was unclear?

11       "Unclear," be specific.

12       Q.    (By Mr. Deutsch)  Yeah.  Did Herb

13  Chambers -- what information did Herb Chambers

14  have on August 17th to know that Ms. Coleman

15  wanted financing through BMW?

16       A.    So by, "Herb Chambers," do you mean

17  Sam?

18       Q.    Yes.

19       A.    So the information that Sam had was

20  to make sure that the paperwork that he had, and

21  the terms and conditions of the deal could still

22  be applied to the client.

23            As I said --

24       Q.    When a customer -- sorry.  Go on.

Melissa Steffy
November 20, 2023

1          A.      I -- I did that job for five years,

2    so...

3          Q.      When a customer has outside

4    financing confirmed, and they are going to

5    purchase a car, and they're not looking for

6    financing through BMW, the case jacket still goes

7    to finance, right?

8                  MS. FUREY:  Objection.

9                  THE WITNESS:  Yes.

10         Q.      (By Mr. Deutsch)  Okay.  And finance

11   would not, under --

12         A.      Well, you need --

13         Q.       -- those circumstances --

14         A.       -- to understand, finance touches

15   all transactions.  For -- every transaction has to

16   go through -- we call it the business office or

17   finance or -- synonymous.

18         Q.      Okay.  So every single car that gets

19   sold or leased from Herb Chambers BMW goes through

20   the finance or business office?

21         A.      Correct.

22         Q.      Okay.  But not every vehicle that's

23   sold or leased, that goes through the finance

24   Office, results in a credit application being

Melissa Steffy
November 20, 2023

1   submitted, right?

2           A.      Correct.

3           Q.      Okay.  And so what mechanisms are

4   there for the finance department, when they get a

5   case jacket, to verify whether this is a file

6   where they are supposed to submit for credit or

7   whether they are not supposed to submit for

8   credit?

9           A.      Every deal stands on its own.  If

10  you have a client who filled out an application

11  directly to BMW, all of that data is already in

12  our system.

13          So we didn't apply for credit for

14  her; she applied for credit on her own.  And it

15  was making sure that the approval was still valid

16  for her, which would have been an exception with

17  BMW because it had expired.

18          Q.      Okay.  So there was an assumption by

19  Herb Chambers on August 17th, that because there

20  was a prior credit application in the file, that

21  Ms. Coleman wanted that application to be

22  resubmitted and affirmed as of August 17th; is

23  that my -- is that correct?

24              MS. FUREY:  Objection.

Melissa Steffy
November 20, 2023

```
 1                 THE WITNESS:  From the paperwork,
 2          yes; I would have made the same assumption.
 3          Q.     (By Mr. Deutsch)  Okay.  Is there a
 4   direct way that Ms. Coleman should have notified
 5   Herb Chambers that she was not interested in
 6   having her application resubmitted prior to August
 7   17th?
 8                 MS. FUREY:  Objection.
 9                 THE WITNESS:  I -- she could have
10          called a sales manager, or Badis.  But, I
11          mean, from the specifics you're saying, and
12          knowing what I know, she hadn't made up her
13          mind.  I don't know when she actually did
14          make up her mind of where she was going to
15          finance.
16          Q.     (By Mr. Deutsch)  Right.  So -- so
17   my question is, what, specifically, should
18   Ms. Coleman have done differently in order to
19   prevent the August 17th credit pull from
20   happening?
21                 MS. FUREY:  Objection.  Asked and
22          answered.
23                 THE WITNESS:  Given us a different
24          lienholder.
```

Melissa Steffy
November 20, 2023

```
 1          Q.    (By Mr. Deutsch)  Okay.  So had
 2  Ms. Coleman specifically notified Badis prior to
 3  August 17th that she needed a purchase and sale
 4  agreement with Pioneer Valley Credit Union,
 5  identified as the lienholder, that would have been
 6  documented in the file and the credit would not
 7  have been pulled on the 17th?
 8               MS. FUREY:  Objection.
 9               THE WITNESS:  I don't know who had
10          the deal.  But potentially, yes.
11          Q.    (By Mr. Deutsch)  Okay.
12               MR. DEUTSCH:  Can we take a
13          five-minute break?
14               THE WITNESS:  Sure.
15               MS. FUREY:  Actually, can we -- can
16          we take 15 minutes; is that okay?
17               MR. DEUTSCH:  Sure.
18               MS. FUREY:  Or ten minutes, ten
19          minutes is fine.
20               MR. DEUTSCH:  Whatever, yeah.  All
21          right.  So let's -- let's just do 11:35;
22          we'll split the difference.
23               MS. FUREY:  Okay.  Perfect.  Thanks,
24          Adam.
```

Melissa Steffy
November 20, 2023

```
1              MR. DEUTSCH:  Yeah.

2

3              (A recess was taken)

4

5              MR. DEUTSCH:  Back on the record.

6       Q.    (By Mr. Deutsch)  Okay.  Ms. Steffy,

7  there is a -- the dealership uses a program called

8  "DealerSocket," that helps to run client

9  management information; is that right?

10      A.    Yes.

11      Q.    And there is a component of that

12 program called "SocketTalk," where employees can

13 communicate directly with a customer via text

14 message, right?

15      A.    Yes.

16      Q.    All right.  And communications that

17 are done over SocketTalk by employees of Herb

18 Chambers are maintained by the dealership, right?

19      A.    Well, we don't own the software,

20 so -- what do you mean, "maintained"?

21      Q.    Meaning that the dealership has

22 access to review communications between an

23 employee of Herb Chambers and a customer that are

24 done over SocketTalk.
```

Melissa Steffy
November 20, 2023

1        A.      Yes.

2        Q.      Okay.  And do you recall reviewing

3   communications between employees of the dealership

4   and Ms. Coleman over SocketTalk?

5        A.      It's kind of ironic because the last

6   time she bought a car -- you have to opt a client

7   in for texting, and my initials are M.S., and I'm

8   the one who opted her in.  And she -- so yeah, so

9   I initiated it, like -- whatever, yes.

10       Q.      Back in 2018, her -- her original

11  transaction?

12       A.      Yeah.

13       Q.      Okay.

14       A.      Correct.

15       Q.      And -- and in 2022, there were

16  communications from employees of Herb Chambers

17  with Ms. Coleman over SocketTalk, right?

18       A.      Correct.

19       Q.      Okay.  And one of those employees

20  that communicated with Ms. Coleman over SocketTalk

21  was Mike Perry, right?

22       A.      Correct.

23       Q.      And those communications happened

24  before they switched over to personal text

Melissa Steffy
November 20, 2023

1  management team and Mr. Perry at that time?

2        A.    Correct.

3        Q.    And so any of the text messages over

4  SocketTalk sent by an employee go to the whole

5  team, not just the customer?

6        A.    No.  It -- not the whole team.

7  Client advisors don't have access to that.  It

8  would be people in our business development office

9  and myself and our sales managers would have

10  access to that.  But a client -- a -- not -- it's

11  not an open forum.  It's -- you -- you have to

12  have -- you have to have a manager's access to

13  read it.

14        Q.    Okay.

15        A.    And -- and our corporate Office as

16  well.

17        Q.    Okay.  And so what would the nature

18  of the conversation have been with Mr. Perry if he

19  had asked Ms. Coleman to send photographs of her

20  breast via SocketTalk instead of personal text

21  message?

22             MS. FUREY:  Objection.

23             THE WITNESS:  It's speculative.  I

24        mean, I -- I've never seen anything

Melissa Steffy
November 20, 2023

1    A.    I asked why we did a credit check on

2  her, and -- this is so long ago that I'm not going

3  to remember with a huge amount of clarity.  But

4  then had asked for the company that handles our

5  compliance training to see if we could get the

6  credit inquiry taken off of her credit.

7    Q.    Okay.

8    A.    The name of the company --

9    Q.    Who --

10    A.    -- is Profit Portfolio, and I had

11  our business team reach out the gentleman who does

12  the compliance training to see if we -- you always

13  just take the client's side -- to see if we can

14  have the credit inquiry removed.

15    Did I ever --

16    Q.    Okay.

17    A.    -- access her credit?  No.

18    Q.    Sorry.  Did they what?

19    A.    I never accessed her credit and did

20  anything beyond put the request in.

21    Q.    Okay.  So first you did an inquiry

22  into why her credit was pulled.  Who -- who did

23  you speak to or what did you look at for that

24  inquiry?

Melissa Steffy
November 20, 2023

1          A.     Just talked to one of the business

2    managers to ask why the credit was pulled.  And

3    then the company that does our compliance, in

4    order to have it reversed, they know how to have a

5    credit inquiry taken off someone's credit.

6          Q.     Which business manager did you speak

7    to?

8          A.     I don't remember.

9          Q.     Do you recall what they told you as

10   to why the credit was pulled?

11         A.     I don't.

12         Q.     And you didn't take any notes or

13   make any written record of this investigation,

14   right?

15         A.     Not to my -- no, not that I

16   remember.  I just would be, you know, follow --

17   you know, I would know -- probably would have

18   written down her -- her name and, you know, the

19   date, and requested that the inquiry be taken off

20   her credit.

21         Q.     Okay.  Now, other than speaking with

22   someone on the business team, which you don't

23   recall who it was -- well, let -- let me back up.

24                When you say that you spoke with

Melissa Steffy
November 20, 2023

1  someone on the business team, is that someone in

2  the -- in the finance department?

3        A.    Yes.

4        Q.    Yes.  Okay.

5              And you don't recall which member of

6  the finance department that was?

7        A.    You know, they all perform the same

8  duties, so whoever is on.  So if an -- you

9  know, if Employee A does the beginning of the

10 paperwork -- there's three of them, you know, B

11 and C, but they all perform the same function;

12 their -- their positions were interchangeable.  So

13 it would be someone on the business team.

14       Q.    Okay.  And you don't -- I just want

15 to clarify again.  You don't recall the reason

16 that was provided for why the pull was done?

17       A.    The reason from the client or from

18 the employee?

19       Q.    From the employee.

20       A.    No.  I just took this out of the

21 client, and said, you know, this woman didn't end

22 up financing with us; she wants the credit inquiry

23 removed.

24       Q.    Okay.  So then you reached out to

Melissa Steffy
November 20, 2023

1  the compliance company.  Now, did you directly --

2          A.      No.

3          Q.       -- reach out?

4          A.      I didn't do it directly; I had them

5  do it because they're -- they're the ones who

6  have -- they're in here for training, compliance

7  training, selling training.  So I had someone on

8  the business team reach out to our representative

9  from -- the name of the company is Profit

10 Portfolio --

11         Q.      Okay.

12         A.       -- to have the credit inquiry taken

13 off.

14         Q.      And when you say that it's someone

15 on the business team, again, is that someone from

16 the finance department?

17         A.      Correct, yes.  I'm sorry for the

18 semantics there.

19         Q.      No, that's okay.  I just want to

20 make sure -- my concern is that it might be

21 someone from -- from Herb Chambers Corporate, and

22 so I just want to make sure that we're -- we're at

23 Herb Chambers BMW.

24         A.      Correct.

Melissa Steffy
November 20, 2023

1          Q.      Okay.  So do you know which employee

2    from the finance department, from the business

3    team reached out to Profit Portfolio?

4          A.      I don't.

5          Q.      And do you know whether -- I -- I

6    understand it -- it's your testimony that you

7    instructed a member of the business team to reach

8    out to Profit Portfolio, right?

9          A.      Mm-hmm.

10         Q.      Is that a yes?

11         A.      Yes.

12         Q.      Okay.  And you instructed a member

13   of the business team to reach out to Profit

14   Portfolio and inquire as to how and whether they

15   could have the inquiry removed from Ms. Coleman's

16   credit report, right?

17         A.      Correct, yes.

18         Q.      Okay.  Do you know whether a member

19   of the business team actually communicated with

20   Profit Portfolio and followed your instruction?

21         A.      I -- knowing my personality, I

22   probably al -- asked multiple times.  So I don't

23   know if they followed through, but they normally

24   do what I ask them to do.

Melissa Steffy
November 20, 2023

 1          Q.     Okay.  So based on -- on your

 2    standard practices, you would assume that you made

 3    multiple verbal requests for them to follow

 4    through.

 5          A.      I just -- had we -- had we done

 6    what Client X wanted to do, yes.

 7          Q.     Okay.  And there's no written record

 8    of that?

 9          A.     Not to my recollection, no.

10          Q.     Okay.  And -- and you don't remember

11    which person you asked, repeatedly, to follow up

12    with Profit Portfolio?

13          A.     Again, they're all interchangeable,

14    so it could have been anyone.  Did someone -- you

15    know, Client X wants the credit inquiry taken off,

16    has someone followed through on it.

17                 So they -- if I have an issue

18    with -- there is always someone from that team.

19    Every single hour that we're open, there is always

20    someone from that team there.  So they're all

21    interchangeable, and they all can share the same

22    responsibility.

23          Q.     Approximately how many customers a

24    week does the business team deal with?

Melissa Steffy
November 20, 2023

```
 1          A.     Let's see.  In a week, in a really

 2   busy month?  Probably 75.  That would be people

 3   buying cars, people paying for cars, people coming

 4   in to buy an extended warranty, cancel an

 5   extended warranty.  So it's -- it's a

 6   busy -- it -- there are three of them, so it's a

 7   very busy -- it's -- other than the service

 8   advisors, it's the busiest department in the

 9   store.

10          Q.     Okay.  And is it common procedure at

11   Herb Chambers to ask for things to be done by the

12   business team verbally, but not in writing?

13          A.      Yeah.  We -- that's how we

14   communicate with each other.

15          Q.     Does that -- when they're dealing

16   with such high volume, does that create a problem

17   with them completing tasks?

18          A.     It depends what the task is.  I

19   mean -- I mean, everything's documented in terms

20   of, like, the person in sales and compliance

21   issues.

22             But if you want someone to call a

23   client back, I wouldn't put it in writing; I would

24   just say, you know, call Melissa Steffy back.
```