# EXHIBIT E

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 3:23-cv-10050

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ELIZABETH COLEMAN,                    \*

               Plaintiff     \*

v.                                    \*

HERB CHAMBERS BMW OF BOSTON,          \*

a/k/a HERB CHAMBERS 1172, INC.;       \*

JOHN DOES I-X,                        \*

               Defendants    \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF:

KATIE GEORGE

Conducted Remotely

October 18, 2023 at 11:39 a.m.




Christine M. Lo Schiavo

Professional Court Reporter

1  2022 -- well, strike that.
2              The -- the individual who pulled
3  Ms. Coleman's credit in August of 2022 was Sam
4  Desroches; is that right?
5         A.    Yes, that is correct.
6         Q.    Okay.  Now, prior to pulling
7  Ms. Coleman's credit -- on -- strike that.
8              On -- on the day that Ms. Coleman's
9  credit was pulled in August of 2022, nobody from
10 Herb Chambers reached out to Ms. Coleman to
11 confirm that she was going to finance with BMW,
12 right?
13             MS. CASS:  Objection.
14             THE WITNESS:  Obviously, the deal
15        was set up in a way that appeared that she
16        was leasing, because we had a signed
17        purchase and sale saying that's the
18        structure she wanted, and we had the credit
19        application that was already submitted for
20        BMW.  So we were led to believe that is how
21        she wanted to proceed.
22             So we mostly get all of our
23        paperwork in order first, to make sure
24        everything lines up, and then we'll call

1       the customer over the phone to confirm it.

2       Q.    (By Mr. Deutsch)  And that call to

3  the consumer, Ms. Coleman in this case, did not

4  happen prior to the pulling of her credit, right?

5             MS. CASS:  Objection.  Adam, I just

6        want the record to be clear that the

7        parties understand that this is her

8        personal knowledge, her testimony on the

9        basis of her personal knowledge, rather

10       than on behalf of the dealership.

11            MR. DEUTSCH:  Yup.  Of course.

12            MS. CASS:  Thank you.  You can

13       proceed.

14            THE WITNESS:  Repeat the question

15       again, just so I have it right.

16      Q.    (By Mr. Deutsch)  Yeah.  Prior

17  to -- on -- on the day that Ms. Coleman's credit

18  was pulled, there was, to the best of your

19  knowledge, no phone call to Ms. Coleman to confirm

20  that she was moving forward with financing through

21  BMW, right?

22      A.    No.  We were told that she wanted to

23  get her paperwork going, and she didn't want to

24  come back in.  So we needed to do what we call a

1  phone TL, which means you call the customer and
2  discuss things with them to make sure everything's
3  right, over the phone, and then send them the
4  paperwork to sign.
5              The way the deal was set up, it was
6  set up as a lease.  So instead of calling her and
7  having no information prepared, we always have
8  everything prepared, so when we call them, we can
9  speak, you know, professionally on behalf of what
10 their payment would be if it had to change.  So we
11 wouldn't call until after submission.
12      Q.    Oh, okay.  So the call doesn't
13 happen until after the credit is pulled?
14      A.    Correct.  If someone was here in the
15 showroom, they would say, I want to buy this car,
16 and we would go in and do the paperwork with them
17 in person, and they would be there in front of us.
18 But we always still load all the paperwork and
19 prepare it prior to bringing the customer into the
20 office.
21              In her case, she wasn't here, so we
22 prepared it before.
23      Q.    Got it.  Okay.
24              Now, in terms of the -- the standard

1  process for sales to finance, can you explain to

2  me how the folder gets handed off from sales to

3  finance?

4               MS. CASS:  Objection.

5               THE WITNESS:  In a normal situation,

6       the -- so the pile goes into a system that

7       we have that's like a filing rack.  And

8       then we text out, in a group text that has

9       the sales managers and the finance managers

10      on it, saying, "deal," so the finance team

11      knows to come forward and grab what deal is

12      in the rack.

13      Q.    (By Mr. Deutsch)  And then finance

14 looks at the folder and implements protocol based

15 on what's in the folder?

16      A.    Correct.

17      Q.    And so, in this case, Mr. Desroches

18 ran credit based on what he saw in the file?

19              MS. CASS:  Objection.

20              THE WITNESS:  Correct.

21      Q.    (By Mr. Deutsch)  Okay.  And at any

22 point, did you have a chance to review what

23 information was in the file?

24      A.    Yes.  I looked at the file before

Katie George
October 18, 2023

1  texting out the deal.
2      Q.   Okay.  So you reviewed the file
3  after it was on the rack, but before --
4      A.   Yes.
5      Q.   -- it went to finance?
6      A.   Yes.  Sorry for interrupting.  Yes.
7      Q.   Okay.  And do you know who put the
8  file on the rack before you reviewed it?
9           MS. CASS:  Objection.
10           THE WITNESS:  I -- I can't recall on
11      that.
12      Q.   (By Mr. Deutsch)  Do you know if
13  that was Badis or Mr. Perry?
14           MS. CASS:  Objection.
15           THE WITNESS:  I don't recall.  I
16      can't say 100 percent on that.
17      Q.   (By Mr. Deutsch)  Ultimately, from a
18  process standpoint, was there one employee in
19  sales who was responsible for the contents of the
20  folder when it was put on the rack?
21      A.   In a general setting -- statement,
22  you mean?
23      Q.   Well, I -- I understand that you
24  don't know specifically who put the folder on the

1         formal procedures, you know, questions
2         will -- will come in at the 30(b)(6);
3         I -- I can make the distinction.
4         Q.    (By Mr. Deutsch)  Have you ever
5    found that -- that -- strike that.
6              Have you ever experienced the
7    circumstance where an error, in terms of what the
8    customer wanted to do, has resulted because two or
9    more salespeople were speaking with the customer?
10        A.    Would you repeat that?
11        Q.    Yeah.  Have you ever experienced the
12   circumstance where, as a result of two or more
13   salespeople communicating with a customer, there
14   ends up being a mix-up in what the customer is
15   looking for within the files of Herb Chambers?
16             MS. CASS:  Objection.
17             THE WITNESS:  I guess I'd have to be
18        more specific on that.
19        Q.    (By Mr. Deutsch)  There are
20   communications prior to Ms. Coleman's
21   credit -- strike that.
22             Prior to Ms. Coleman's credit being
23   pulled in August of 2022, there are communications
24   between Ms. Coleman and Mr. Perry, wherein the two

Katie George
October 18, 2023

1  of them directly discuss purchasing the car
2  instead of leasing the car.
3           MS. CASS:  Objection.
4       Q.    (By Mr. Deutsch)  You've seen those,
5  right?
6           MS. CASS:  Objection.
7           THE WITNESS:  I don't -- what's -- I
8       don't recall having seen that.  It was an
9       email?
10      Q.    (By Mr. Deutsch)  No.  There are
11 text messages.
12      A.    Okay.
13      Q.    Were those --
14      A.    Those I've seen, yes.
15      Q.    And -- and there were some
16 communications, wherein there was discussion
17 of -- of whether Ms. Coleman would purchase the
18 car instead of lease it, right?
19          MS. CASS:  Objection.
20          THE WITNESS:  Yes.  I did see that
21      in the text messages.
22      Q.    (By Mr. Deutsch)  And in the context
23 of purchasing the vehicle, there were
24 communications -- there were communications

| | |
|---|---|
| 1 | between Ms. Coleman and Mr. Perry about |
| 2 | Ms. Coleman purchasing with financing from her |
| 3 | credit union, right? |
| 4 |         MS. CASS:  Objection. |
| 5 |         THE WITNESS:  Yeah.  I did see that |
| 6 |    in the texts. |
| 7 |    Q.     (By Mr. Deutsch)  Okay.  And those |
| 8 | communications with Mr. Perry all happened before |
| 9 | Ms. Coleman's credit was pulled? |
| 10 |         MS. CASS:  Objection. |
| 11 |         THE WITNESS:  I -- I don't recall |
| 12 |    the dates on it, but I did see the texts -- |
| 13 |    Q.     (By Mr. Deutsch)  Okay.  And there |
| 14 | were no records within the customer's file, when |
| 15 | it went to finance, indicating that she was |
| 16 | looking to purchase the car; is that correct? |
| 17 |         MS. CASS:  Objection. |
| 18 |         THE WITNESS:  With her credit union? |
| 19 |    No, there was not. |
| 20 |    Q.     (By Mr. Deutsch)  Okay.  Was there |
| 21 | any record in the folder, when it went to finance, |
| 22 | indicating that Ms. Coleman was looking to |
| 23 | purchase the car through BMW Finance? |
| 24 |         MS. CASS:  Objection. |

1           THE WITNESS:  No.  Just lease.

2           Q.    (By Mr. Deutsch)  Okay.  Now, prior

3    to Ms. Coleman's credit being pulled, she had also

4    communicated with Badis about purchasing the

5    vehicle instead of leasing the vehicle, right?

6           MS. CASS:  Objection.

7           THE WITNESS:  I don't know that.

8           Q.    (By Mr. Deutsch)  Okay.  Have you

9    had an opportunity to review the text messages

10   between Badis and Ms. Coleman?

11          A.    No, I have not.

12          Q.    Okay.  When a customer is

13   seeking -- are -- strike that.

14                Are there circumstances where a

15   customer needs a copy of a car's title prior to

16   finalizing purchase paperwork?

17          A.    No.  We would not provide that

18   without them signing documents.

19          Q.    Okay.  What documents would need to

20   be signed for the customer to obtain a copy of the

21   title?

22          A.    The purchase and sales agreement.

23          Q.    All right.  I'm going to upload, for

24   a moment, Exhibit 3.

1              MR. DEUTSCH:  It is taking a long
2       time.
3              MS. CASS:  Thank you.
4       Q.     (By Mr. Deutsch)  Okay.  So this is
5  a document from Herb Chambers production.  Right
6  now we're looking at Bates stamp page 342.
7       A.     Uh-huh.
8       Q.     This is an email from Badis to
9  Ms. Coleman; do you see that?
10      A.     Uh-huh.
11      Q.     And it's dated August 13, 2022; do
12 you see that?
13      A.     Uh-huh.
14      Q.     So this is before Ms. Coleman's
15 credit was pulled, right?
16      A.     (Witness nodding)
17      Q.     Can you verbally answer?
18      A.     Yes, sorry.  Yes.
19      Q.     Okay.  The email says, "Elizabeth,
20 attached the PNS (sic) and title copies front and
21 back.  Let me know if you need anything else."
22             And then, if we scroll down, there's
23 a copy of the title, the front and the back; do
24 you see that?

1      A.     Mm-hmm.  Yes, I do.

2      Q.     Okay.  Now, my understanding, from

3 your testimony a few moments ago, is that there's

4 no circumstances when a copy of the title would be

5 provided to the customer prior to closing a

6 purchase deal, right?

7             MS. CASS:  Objection.

8             THE WITNESS:  Can you scroll down?

9        Can I see the P&S that was attached, too?

10       So this would do nothing for her to finance

11       through an outside bank, this P&S.

12            MS. MIKELS:  So can I just make a

13       suggestion, and Brenna, maybe you can help.

14       Katie, if you need to see the document, or

15       you're having trouble seeing the pages, you

16       can also open it from the chat; that's why

17       Adam dropped it in there, and you can --

18            THE WITNESS:  Oh, okay.

19            MS. MIKELS:  -- look at the

20       document.  I'm sorry.  I -- it doesn't have

21       anything to do with your answer.  I just

22       wanted to make sure you are aware that you

23       can actually --

24            THE WITNESS:  Yeah.

1              MS. MIKELS:  -- look at the
2      document.
3              THE WITNESS:  No.  So --
4              MS. MIKELS:  Sorry, Adam.
5              THE WITNESS:  -- this doesn't --
6      this document doesn't list a lienholder.
7         Q.    (By Mr. Deutsch)  Well, why
8  did -- do you have any understanding of why Badis
9  sent this?
10             MS. CASS:  Objection.
11             THE WITNESS:  To the best of my
12      knowledge, I would say he was trying to be
13      helpful.  But this wouldn't help her secure
14      financing with an outside bank.
15        Q.    (By Mr. Deutsch)  Okay.
16  When -- Badis is no longer employed at Herb
17  Chambers, right?
18        A.    Correct.
19        Q.    I'm sorry.  Did you answer verbally?
20  I didn't hear it.
21        A.    Correct.
22        Q.    And did he leave on his own, or was
23  he terminated?
24             MS. CASS:  Objection.

1           THE WITNESS:  He left on his own to
2      move back to the country he is from.
3      Q.    (By Mr. Deutsch)  Okay.  I'm
4 uploading Exhibit 4.
5
6                (Exhibit 4, Text Messages
7                Between Ms. Coleman and
8                Mr. Boussetta, marked)
9
10      Q.    (By Mr. Deutsch)  So this is
11 Exhibit 4.  These are text messages between
12 Ms. Coleman and Badis that were produced as part
13 of Ms. Coleman's production.  Have you ever seen
14 these?
15      A.    No, I don't believe I've seen these.
16      Q.    Okay.  On August 9th, Badis has a
17 text message here -- we can see that it says,
18 "Good morning, Elizabeth, just wanted to check if
19 you were able to get numbers from your bank or if
20 you have any questions?"
21            Based on your review of
22 Ms. Coleman's file at Herb Chambers, there was no
23 indication that Ms. Coleman was seeking financing
24 at an outside bank at the time her credit was

1  pulled, right?
2           MS. CASS:  Objection.
3           THE WITNESS:  No.  Not in her file.
4       Q.    (By Mr. Deutsch)  Now, this text
5  message suggests that Badis knew that Ms. Coleman
6  was seeking numbers from her bank in connection
7  with the outside financing.  Is -- is there a
8  process by which you would expect a salesperson to
9  indicate that knowledge within the customer's
10 file?
11          MS. CASS:  Objection.
12          THE WITNESS:  If the customer wanted
13     to go with an outside bank, they would need
14     to gather lienholder information and
15     provide it so it can be printed -- printed
16     on the documents.
17      Q.    (By Mr. Deutsch)  Okay.  Now, on
18 August 13th, Ms. Coleman provides Badis with this
19 information here that she needs for Pioneer Valley
20 Federal Credit Union; do you see that?
21      A.    Yes.
22      Q.    And then, when we look back at
23 Exhibit 3, we see that on that same date, on
24 August 13th, Badis provides Ms. Coleman with the

1  P&S and title copies, front and back, that we
2  looked at moments ago, right?
3        A.    Yes.
4        Q.    I understand that you were not
5  involved in these communications, but when you
6  look at this, these two documents together, it
7  does suggest that Badis had knowledge that
8  Ms. Coleman was communicating with Pioneer Valley
9  Federal Credit Union on August 13th to secure
10 financing for the purchase of her vehicle, right?
11             MS. CASS:  Objection.
12             THE WITNESS:  Yes.
13       Q.    (By Mr. Deutsch)  And there was no
14 indication placed within her customer file at Herb
15 Chambers, indicating that she was seeking
16 financing at Pioneer Valley at that time, right?
17             MS. CASS:  Objection.
18             THE WITNESS:  Not to my knowledge,
19      no.
20       Q.    (By Mr. Deutsch)  Okay.  If there
21 was an indication in Ms. Coleman's file that she
22 was pursuing purchasing of the vehicle with
23 outside financing, when it went to finance on
24 August 17, 2022, would finance have pulled her

```
 1  credit following the normal procedure?
 2               MS. CASS:  Objection.
 3               THE WITNESS:  No, they would not
 4       have.
 5       Q.     (By Mr. Deutsch)  Okay.  I'm going
 6  to upload Exhibit 5.
 7               MR. DEUTSCH:  Off the record for a
 8       second.
 9
10               (Off record discussion)
11
12               (Exhibit 5, Text Messages Through
13               SocketTalk, marked)
14
15               MR. DEUTSCH:  We can go back on the
16       record here.
17       Q.     (By Mr. Deutsch)  Okay.  So I'm
18  going to share my screen again, and we're on
19  Exhibit 5 here.  We're looking at Herb Chambers'
20  production, starting at page 5 here.  And what
21  exactly are we looking at, Ms. George?
22       A.     This is a text conversation through
23  our client database system.
24       Q.     And that is SocketTalk, right?
```